[No. A023149. Sixth Dist. May 20, 1985.]

LESLIE F. HENSLEE, Plaintiff and Respondent, v.
DEPARTMENT OF MOTOR VEHICLES, Defendant and Appellant.

446

COUNSEL

John K. Van de Kamp, Attorney General, N. Eugene Hill, Assistant Attorney General, Harold W. Teasdale and Victor D. Sonenberg, Deputy Attorneys General, for Defendant and Appellant.

Gerald M. Schneider and Robert L. Denebeim for Plaintiff and Respondent.

OPINION

PANELLI, P. J.—Appellant Department of Motor Vehicles (DMV) appeals from a judgment which ordered a writ of mandate to issue directing DMV to set aside its order suspending respondent Leslie Henslee's driver's license. For reasons discussed below, we reverse the judgment and direct the trial court to reinstate the suspension order.

*Facts*

On July 25, 1982 respondent was arrested by Officer Keith Viveiros, of the Stanford University Police Department,[1] for violation of Vehicle Code section 23152, subdivision (a) (driving under the influence).[2] Pursuant to section 13353,[3] Officer Viveiros submitted to the DMV a sworn statement

---

[1]Officer Viveiros testified that under an agreement with the Santa Clara County Sheriff's Department, Stanford University police are trained and employed as sheriff's deputies.

[2]Unless otherwise indicated, all statutory references are to the Vehicle Code.

[3]At the time of respondent's arrest, section 13353 provided: "(a)(1) Any person who drives a motor vehicle shall be deemed to have given his or her consent to a chemical test of his or her blood, breath, or urine for the purpose of determining the alcoholic content of his or her blood if lawfully arrested for any offense allegedly committed in violation of Section 23152 or 23153. The test shall be incidental to a lawful arrest and administered at the direction of a peace officer having reasonable cause to believe the person was driving a motor vehicle in violation of Section 23152 or 23153. The person shall be told that his failure to submit to, or the noncompletion of, a chemical test will result in the suspension of the person's privilege to operate a motor vehicle for a period of six months.

"(2) The person arrested shall have the choice of whether the test shall be of his or her blood, breath, or urine, and the person shall be advised by the officer that he or she has such a choice. If the person arrested either is incapable, or states that he or she is incapable, of completing any chosen test, the person shall then have the choice of submitting to and completing any of the remaining tests or test, and the person shall be advised by the officer

alleging that respondent refused to submit to a chemical test. Based on the statement, the DMV notified respondent that her driving privileges were to be suspended. Respondent subsequently requested a formal hearing, which was held on November 15, 1982. At the hearing, testimony was taken on these issues from Officer Viveiros and respondent.

Officer Viveiros testified as follows: On July 25, 1982 at approximately 2:15 a.m. he observed respondent's vehicle, parked and facing southbound in the northbound lane of Stanford Avenue in Palo Alto. Although the vehicle was stopped, the engine was running and the headlights were on. The officer pulled behind the vehicle and noticed that respondent appeared to be asleep behind the wheel. He approached the driver's side of the vehicle, opened the door, and "shoo[k] her vigorously—hard enough to awaken someone who is simply asleep." Because he failed to awaken her, the officer then placed respondent in a twist lock which is "generally a defensive move but [it's] also used to awaken . . . somebody who is intoxicated and has fallen asleep."

In response to the twist hold, respondent woke up and said something regarding a passenger. The officer noticed that her speech was slurred. He also detected a slight odor of an alcoholic beverage coming from the car. While he was kneeling next to the driver's side of the car, respondent put the transmission of the vehicle into "drive" and attempted to drive away. However, the car only traveled several "inches" before the officer was able to reach in and physically stop her from proceeding. Respondent repeated this conduct two or three more times, but on each occasion she was proceeding so slowly that the officer was able to reach in and stop the vehicle.

---

that the person has that choice.

" . . . . . . . . . . . . . . . . .

"(b) If any person refuses the officer's request to submit to, or fails to complete, a chemical test, upon receipt of the officer's sworn statement that the officer had reasonable cause to believe the person had been driving a motor vehicle in violation of Section 23152 or 23153 and that the person had refused to submit to, or did not complete, the test after being requested by the officer, the department shall suspend the person's privilege to operate a motor vehicle for a period of six months. The officer's sworn statement shall be submitted on a form furnished or approved by the department. No such suspension shall become effective until 10 days after the giving of written notice thereof, as provided for in subdivision (c).

"(c)(1) The department shall immediately notify the person in writing of the action taken and, upon the person's request in writing and within 15 days from the date of receipt of the request, shall afford the person an opportunity for a hearing in the same manner and under the same conditions as provided in Article 3 (commencing with Section 14100) of Chapter 3. For purposes of this section, the scope of the hearing shall cover the issues of whether the peace officer had reasonable cause to believe the person had been driving a motor vehicle in violation of Section 23152 or 23153, whether the person was placed under arrest, whether the person refused to submit to, or did not complete, the test or tests after being requested by a peace officer, and whether, except for the persons described in subdivision (a) who are incapable of refusing, the person had been told that his or her driving privilege would be suspended if he or she refused to submit to, or did not complete, the test."

Officer Viveiros then physically removed respondent from the car. At that time he noted a mild odor of an alcoholic beverage was coming from her person. He further noticed that she walked in a "staggered and unstable" manner. The officer requested respondent to take field sobriety tests, but she refused to cooperate. The officer then placed appellant under arrest.

Officer Viveiros and his partner then transported respondent to the Stanford Police Department. Upon arrival, the officers requested respondent to submit to a chemical test and read her the admonition as required by section 13353.[4] The officers read the admonition seven or eight times and explained "in depth" the necessity to take a chemical test. Respondent, however, refused to take the test. At the time, the officer noted in his implied consent report that respondent stated: "I'm not taking any tests unless I have my lawyer there. I want to talk to my lawyer now! I'm not making any decisions until I talk to my lawyer." After respondent made these statements, the officers reread the portion of the admonition stating that she didn't have the right to have an attorney present. Respondent, however, simply repeated her previous refusal.

Respondent, on the other hand, testified that she had been sick and had "passed out" while being driven home earlier that evening.[5] When she awoke in response to Officer Viveiros' twist lock, she felt "very frightened" and thought she was "being attacked." She admitted, however, that she did not have a clear recollection of events subsequent to her being awakened because she had been in a "deep sleep" and felt "very groggy." When asked by the hearing officer whether she had any independent "recollection" of what she did in regard to the vehicle moving, she admitted that she did not.

Respondent confirmed that the chemical test advisement statement was read to her at the Stanford police station. She testified, however, that she did not submit to the test because she was "getting out of sorts with [the

---

[4]The officer testified that he read the following paragraph verbatim: "You are required by state law to submit to a chemical test to determine the alcoholic content of your blood. You have a choice of whether the test is to be of your blood, breath, or urine. If you refuse to submit to a test or fail to complete a test your driving privilege will be suspended for a period of six months. You do not have the right to talk to an attorney or to have an attorney present before stating whether you will submit to a test, before deciding which test to take, or during the administration of the test chosen. If you are incapable, or state you are incapable of completing the test you choose, you must submit to and complete any of the remaining tests or test. If you refuse to submit to a test, the refusal may be used against you in a court of law."

[5]She testified that "[w]e got into my car and I was on the passenger's side—one of the gentlemen was driving. The next thing I remember Officer Viveiros . . . was twisting my arm."

officers] for what I thought was not allowing me to contact my attorney which I thought I had the right to do."

Based upon the testimony presented at the administrative hearing, the DMV hearing officer made the following findings: "(1) The officer had reasonable cause to believe that LESLIE FRANCES HENSLEE had been driving a motor vehicle in violation of Section 23152 or 23153 of the Vehicle Code. [¶] (2) Ms. HENSLEE was lawfully arrested. [¶] (3) Ms. HENSLEE was told that her driving privilege would be suspended for a period of six months if she refused to submit to or failed to complete a chemical test of the alcoholic content of her blood. [¶] (4) Ms. HENSLEE refused to submit to or failed to complete a test of her blood, breath or urine to determine the alcoholic content of her blood when requested to do so by a peace officer." Based upon these findings, the DMV ordered respondent's driving privilege suspended for six months.

On December 30, 1982, respondent filed a petition for writ of mandate, pursuant to Code of Civil Procedure section 1094.5, seeking to reverse the DMV's order suspending her driving privileges. The matter was heard on March 15, 1983.

On April 28, 1983, the trial judge filed a memorandum of tentative decision, stating that respondent was obviously drunk and disoriented on the night of her arrest and that she did in fact refuse to submit to a chemical test. However, the judge found the arrest for driving under the influence was not warranted because respondent did not "drive" in the presence of the officer.[6] Based upon this finding that the arrest was unlawful, the court subsequently granted respondent's petition for writ of mandate. DMV appeals this decision.

### Discussion

DMV contends the lower court erred in finding respondent's conduct did not constitute "driving" within the meaning of the drunk driving statutes. We agree with this contention and therefore find that respondent's arrest was lawful. Accordingly, we reverse the judgment below and rein-

---

[6]Regarding this finding, the memorandum stated "she . . . attempted (with the officer's arm on hers) to drive off. The movement was only a few inches . . . . While it stretches one's sense of justice a bit to grant the writ, I feel I must do so because I would otherwise have to say that the *slight movement* her vehicle made while she was in the custody of the officer constituted 'driving' under the appropriate provision of the Vehicle Code. This I am not willing to do, because such a minimal movement, such a reflexive action in response to the stimulus of the officer certainly is not the type of driving which the Vehicle Code seeks to prohibit."

state DMV's order suspending respondent's driving privilege for six months.

■ The application of the implied consent law is conditioned upon a lawful arrest for driving while under the influence. (§ 13353, subd. (a)(1); *People* v. *Superior Court* (1972) 6 Cal.3d 757, 765 [100 Cal.Rptr. 281, 493 P.2d 1145]; *Parker* v. *Sillas* (1976) 57 Cal.App.3d 206, 211 [128 Cal.Rptr. 907].) ■ In order for an officer to make an arrest for a misdemeanor without a warrant he must have reasonable cause to believe the person committed the offense *in his presence.*[7] (Pen. Code, § 836, subd. 1.) Section 23152, subdivision (a) provides that it is unlawful "for any person who is under the influence of an alcoholic beverage . . . to drive a vehicle." It has been recognized that an essential element of this offense is the act of driving an automobile. (*People* v. *Walker* (1962) 203 Cal.App.2d 552, 555 [21 Cal.Rptr. 692].) Accordingly, an arrest for misdemeanor drunk driving is unlawful unless the officer was present when such driving occurred. (*People* v. *Ashley, supra,* 17 Cal.App.3d 1122, 1125; *People* v. *Walker, supra,* at p. 555.)

■ The sole issue on appeal is whether respondent drove in the presence of the arresting officer. Upon our examination of the record, we find the facts herein require an answer in the affirmative.

The undisputed evidence shows that the officer found respondent sleeping in the driver's seat of her vehicle with the motor running and lights on. The vehicle was parked facing the wrong direction in a traffic lane. When respondent awoke, she briefly spoke to the officer and then affirmatively placed the vehicle's transmission into drive, which caused the car to move forward several inches. Had it not been for the quick actions of Officer Viveiros, respondent would have continued her wrong way journey down Stanford Avenue where there was a great likelihood of causing serious injury to others.

The court below found that respondent's conduct was "not the type of conduct which the Vehicle Code seeks to prohibit." We refuse to read section 23152, subdivision (a) so narrowly. In our opinion the term "drive" within the meaning of this code section includes the situation where, as here, an intoxicated individual actively asserts control over a vehicle and takes

---

[7]The courts in this state have liberally construed the presence requirement. (*People* v. *Goldberg* (1969) 2 Cal.App.3d 30, 33 [82 Cal.Rptr. 314]; *McDonald* v. *Justice Court* (1967) 249 Cal.App.2d 960 [58 Cal.Rptr. 29], overruled on other grounds in *People* v. *Superior Court, supra,* 6 Cal.3d 757, 765-766, fn. 7; *People* v. *Jordan* (1977) 75 Cal.App.3d Supp. 1, 13 [142 Cal.Rptr. 401]; see also *People* v. *Ashley* (1971) 17 Cal.App.3d 1122, 1126 [95 Cal.Rptr. 509].)

every step necessary to resume travel along the public road. Accordingly, we hold that as a matter of law respondent "drove" her vehicle in the presence of Officer Viveiros and therefore find her arrest for driving while intoxicated was lawful.

■ In reaching this determination we are mindful that "[a] statute must be read in light of both the objective it seeks to achieve and the evil it seeks to avert." (*Sanchez* v. *Alexis* (1982) 131 Cal.App.3d 709, 715 [182 Cal.Rptr. 593].) ■ It is well established that the legislative intent underlying our drunk driving statutes is to deter the intoxicated driver and thus reduce the life threatening hazards caused by such drivers. Recognizing this necessity for strong deterrence, the California Supreme Court recently delineated the "horrific risk[s] posed by those who drink and drive." (*Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 262 [198 Cal.Rptr. 145, 673 P.2d 732].) "The drunk driver cuts a wide swath of death, pain, grief, and untold physical and emotional injury across the roads of California and the nation. The monstrous proportions of the problem have often been lamented in graphic terms by this court and the United States Supreme Court. [Citations.] As observed in *Breithaupt* v. *Abram* (1957) 352 U.S. 432, . . . '[t]he increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield.' (*Id.,* at p. 439 . . . .) Indeed, in the years 1976 to 1980 there were many more injuries to California residents in alcohol-related traffic accidents than were suffered by the entire Union Army during the Civil War, and more were killed than in the bloodiest year of the Vietnam War. [Citation.]" (*Burg, supra,* at p. 262.)

In our opinion these policies of prevention and deterrence underlying our drunk driving statutes strongly support our determination that respondent "drove" her vehicle while in the presence of the officer. In fact, respondent's conduct illustrates the precise danger which the statutes seek to obviate. As described earlier, had it not been for the clear thinking of Officer Viveiros, respondent, in an extremely intoxicated condition, would have moved her vehicle into a traffic lane, while facing the wrong direction. There is no doubt that *this* behavior is the type of conduct which the Legislature sought to deter when they enacted the statute. (See *Burg* v. *Municipal Court, supra,* 35 Cal.3d 257.) Moreover, it is a "rational surmise" that one who is seated in a vehicle with the motor on and who places the transmission into drive, "intends to resume public travel." (*City of Kansas City* v. *Troutner* (Mo.App. 1976) 544 S.W.2d 295, 299.) Therefore, respondent's conduct posed a threat to public safety just as if she had been found traveling on a highway.

Respondent claims, however, that the requirement that a defendant drive while in the presence of the arresting officer should be strictly construed,

citing *People* v. *Engleman* (1981) 116 Cal.App.3d Supp. 14 [172 Cal.Rptr. 474] and *People* v. *Kelley* (1937) 27 Cal.App.2d Supp. 771 [70 P.2d 276]. However, because both cases are factually distinguishable from the instant case, we find respondent's reliance to be misplaced.

In *Kelley,* the defendant, while intoxicated, entered a car involved in a collision, started the motor and "while others shoved, aided in backing [the vehicle] some four or five feet." (*Supra,* 27 Cal.App.2d Supp. at p. 772.) Reversing defendant's conviction for driving under the influence, the court held defendant's conduct did not constitute "driving" within the meaning of the statute. In reaching this conclusion, the court reasoned that "[t]he car in question . . . was being moved into a safe location at the same place. *It was being taken out of the way of traffic, not into it.* In its disabled condition it could not have been driven or moved under its own power for any considerable distance." (*Id.,* at p. 773, italics added.) Moreover, the court emphasized that this was an "emergency situation" and that it was not "undertak[ing] to give a definition to the word 'drive' which would be applicable in all situations." (*Id.,* at p. 775.)

By contrast, here there was *no* emergency situation and respondent's vehicle was fully operable. Respondent, unlike the defendant in *Kelley,* had no safety objective in mind as she sought to move her vehicle into traffic. The *Kelley* court's reasoning, therefore, is clearly inapplicable in the instant case.[8]

Respondent's reliance on *People* v. *Engleman* is similarly misplaced. In *Engleman,* the officers found defendant asleep in a parked car with its motor running. The court held defendant did not drive in the presence of the officers and therefore could not be validly arrested for a misdemeanor drunk driving offense. However, we do not find this case to be persuasive authority since the court failed to provide any analysis underlying its decision. Moreover, the *Engleman* facts are clearly distinguishable from those in the instant case. There, the car was parked on the shoulder of the road and there was no evidence that defendant attempted to operate the vehicle in the presence of the officers. By contrast, in the instant case, respondent was parked the wrong way *in a traffic lane* and, unlike the defendant in *Engleman,* she actively placed the car in "drive" and would have continued but for the officer's quick actions.

---

[8]In *People* v. *Jordan, supra,* 75 Cal.App.3d Supp. 1, the court similarly distinguished *Kelley.* In *Jordan* the court held that the defendant, who was pedaling a moped "considerably more than four or five feet" and without the motor turned on, "drove" within the meaning of the drunk driving laws and therefore could be validly arrested for the driving while intoxicated offense. (*Supra,* at Supp. p. 8.)

The judgment is reversed and the trial court is directed to deny the writ of mandate and reinstate the suspension order.

Agliano, J., and Brauer, J., concurred.

Respondent's petition for review by the Supreme Court was denied July 24, 1985.