[No. B151669. Second Dist., Div. Two. Jan. 24, 2002.]

WASHINGTON MUTUAL BANK, FA, Petitioner, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
STEVEN GUILFORD et al., Real Parties in Interest.

**COUNSEL**

Stroock & Stroock & Lavan, Julia B. Strickland, Lisa M. Simonetti and JiAe Kim for Petitioner.

No appearance for Respondent.

Lieff, Cabraser, Heimann & Bernstein, William B. Hirsch, Barry R. Himmelstein, David L. Fiol; Girard & Green, Robert S. Green, Gordon M. Fauth, Jr., and Rosemary M. Rivas for Real Parties in Interest.

**OPINION**

**BOREN, P. J.**—Petitioner, Washington Mutual Bank, FA (Washington Mutual) is a federally chartered savings and loan association organized and operating under the Home Owners' Loan Act (HOLA).[1] (12 U.S.C. § 1461 et seq.) Washington Mutual seeks a writ of mandate directing the trial court to vacate an order overruling Washington Mutual's demurrers to those causes of action contained within real parties in interest's class-action complaints alleging violations of Civil Code section 2948.5 (Section 2948.5),[2] the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) and California's Unfair Practices Act (UPA). (Bus. & Prof. Code, § 17200 et seq.) Each of these counts is premised on the theory that Washington Mutual's practice of charging preclosing interest on home loans is unlawful. We hold that such state law claims are preempted by the HOLA and the act's implementing regulations. We also hold that Section 2948.5 does not prohibit a lender from charging interest on a home loan prior to close of escrow in those instances where the lender deposits the loan proceeds into escrow by wire or electronic transfer. We will therefore issue a writ directing the superior court to set aside its order overruling Washington Mutual's demurrers.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The complaints*

Real parties in interest Steven Guilford and Robert W. Guilford, trustee of the Guilford Revocable Family Trust, filed a class action lawsuit against Washington Mutual on behalf of themselves and similarly situated borrowers

---

[1]The HOLA was originally passed as the "Home Owners' Loan Act of 1933." The "of 1933" was struck by amendments to the act in 1989.

[2]Section 2948.5 was amended, effective January 1, 2002 (Stats. 2001, ch. 302, § 1). All references to Section 2948.5 in this opinion pertain to former section 2948.5. (Added by Stats. 1985, ch. 1393, § 1, p. 4929; amended by Stats. 1990, ch. 872, § 1, p. 3694.)

in California and the general public. Shortly thereafter, real party in interest Stuart C. Talley filed a similar lawsuit.[3]

The Guilford complaint alleged that Washington Mutual and its predecessor in interest, Home Savings of America, FSB, originated thousands of residential mortgage loans in California and, in connection with those loans, required borrowers to pay, prior to close of escrow, one day's preclosing interest. It was asserted that this practice violated Section 2948.5 and the UPA, constituted conversion, and unjustly enriched Washington Mutual and Home Savings.

The Talley complaint alleged that Washington Mutual's practice of charging preclosing interest was in breach of the implied covenant of good faith and fair dealing, unjustly enriched Washington Mutual and Home Savings, and violated the UPA and the Consumers Legal Remedies Act.

## B. *Washington Mutual's demurrer*

Washington Mutual demurred to those causes of action that alleged violations of the UPA, the Consumers Legal Remedies Act and Section 2948.5. Washington Mutual argued that each of these counts should be dismissed based on the doctrine of federal preemption, and that Section 2948.5 does not apply because wire and electronic transfers represent cash.

## C. *The trial court's ruling*

The trial court overruled Washington Mutual's demurrers to those causes of action alleging violations of the UPA, the Consumers Legal Remedies Act and Section 2948.5.[4] This petition followed.

## II. ISSUES

This case presents two issues. The first is whether the HOLA, together with its implementing regulations, preempts state law claims alleging that Washington Mutual, a federal savings and loan association, violated Section 2948.5, the UPA, and the Consumers Legal Remedies Act by charging preclosing interest on home loans. The second is whether Section 2948.5 prohibits a lender from charging interest on loan proceeds made immediately available to the borrower through escrow by wire or electronic transfer.

---

[3]The Guilford and Tally lawsuits have been consolidated.

[4]The Guilford complaint also included a cause of action based on the California Residential Mortgage Lending Act (Fin. Code, § 50000 et seq.), and the Talley complaint's cause of action for violation of the UPA was predicated, in part, on the same act. For reasons unrelated to the issues raised in this petition, the trial court sustained Washington Mutual's demurrer without leave to amend as to the cause of action predicated on the California Residential Mortgage Lending Act set forth in the Guilford complaint, and struck all references to the act from both the Guilford and Talley complaints. These rulings are not before this court.

## III. Discussion

### A. *Standard of review*

■ A pure legal issue of preemption is properly handled by demurrer, and its denial is properly reviewed by petition for writ of mandate. (See *American Internat. Group, Inc. v. Superior Court* (1991) 234 Cal.App.3d 749, 755 [285 Cal.Rptr. 765].) ■ Where, as here, the issues are tendered on undisputed facts and are purely legal in nature, it calls for the court's independent appellate review. (*Ibid.*)

### B. *General principles of preemption*

■ Congress has the authority to preempt state law by virtue of the supremacy clause of the United States Constitution, which provides that "laws of the United States . . . shall be the supreme law of the land; and the judges in every state shall be bound thereby, any thing in the Constitution or laws of any state to the contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) "Such preemption is found in 'three circumstances.' [Citation.] 'First Congress can define explicitly the extent to which its enactments pre-empt state law.' [Citations.] 'Second, in the absence of explicit statutory language, state law is pre-empted when it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.' [Citations.] 'Finally, state law is pre-empted to the extent that it actually conflicts with federal law.' [Citations.]" (*Smiley v. Citibank* (1995) 11 Cal.4th 138, 147-148 [44 Cal.Rptr.2d 441, 900 P.2d 690].) "The critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law." (*Louisiana Public Service Comm'n v. FCC* (1986) 476 U.S. 355, 369 [106 S.Ct. 1890, 1899, 90 L.Ed.2d 369].)

### C. *Preemptive effect of federal regulations*

■ Federal regulations may preempt state law just as fully as federal statutes. (*Glendale Fed. Sav. & Loan Ass'n v. Fox* (C.D.Cal. 1978) 459 F.Supp. 903.) An agency may preempt state law through regulations that are within the scope of its statutory authority and that are not arbitrary. (See *Louisiana Public Service Comm'n v. FCC, supra,* 476 U.S. 355, 369 [106 S.Ct. 1890, 1898-1899] ["Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation."].)

### D. *The presumption of nonpreemption*

■ In an area of law traditionally occupied by the states, such as the exercise of a state's police powers, we begin with the presumption that these

laws are not superseded by a federal act unless Congress's intent to preempt is clear and manifest. (*California v. ARC America Corp.* (1989) 490 U.S. 93, 101 [109 S.Ct. 1661, 1665, 104 L.Ed.2d 86].) Laws concerning consumer protection, such as the UPA and the Consumers Legal Remedies Act, are included within the states' police power and thus subject to this heightened presumption against preemption. (See *California v. ARC American Corp., supra,* at p. 101, *Smiley v. Citibank, supra,* 11 Cal.4th 138, *Spielholz v. Superior Court* (2001) 86 Cal.App.4th 1366, 1371-1372 [104 Cal.Rptr.2d 197].) The party claiming federal preemption bears the burden of establishing it. (See *Wells Fargo Bank v. Superior Court* (1991) 53 Cal.3d 1082, 1109 [282 Cal.Rptr. 841, 811 P.2d 1025] (conc. opn. of Kennard, J.).)

E. *Real parties in interest's state law claims*

Washington Mutual, a federally chartered savings association, transfers funds into escrow by wire or electronic transfer and begins charging interest one business day prior to the close of escrow. Real parties in interest claim that this practice violates three state statutes. The first, Section 2948.5, provides that when the purchaser of a one- to four-unit residential dwelling takes out a mortgage and the lender deposits the loan proceeds into escrow, the lender may not begin charging interest on the loan before the close of escrow unless the lender deposits the funds in cash or by other specified methods. The second, the UPA (Bus. & Prof. Code, § 17200), prohibits unlawful, unfair and fraudulent business practices. The third, the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.), prohibits deceptive practices in consumer transactions.

F. *The HOLA and regulations thereunder*

The federal law claimed by Washington Mutual to expressly preempt Section 2948.5, the UPA, and the Consumers Legal Remedies Act is the HOLA, together with regulations promulgated by the Office of Thrift Supervision (OTS), the agency charged with administering the act.

The HOLA was a product of the Great Depression of the 1930's. The HOLA was "intended 'to provide emergency relief with respect to home mortgage indebtedness' at a time when as many as half of all home loans in the country were in default. [Citations.] Local institutions that had previously supplied funds to finance homes had ceased doing business or had discontinued such long-term loans, so that more than half the counties in the country, containing almost one-fifth of the total population, were without

home-financing institutions. [Citations.] [¶] In order to ameliorate these conditions, Congress enacted the HOLA, 'a radical and comprehensive response to the inadequacies of the existing state systems.' [Citation.] The Act provided for the creation of a system of federal savings and loan associations, which would be regulated by the [Federal Home Loan Bank Board] so as to ensure their vitality as 'permanent associations to promote the thrift of the people in a cooperative manner, to finance their homes and the homes of their neighbors.' [Citations.]" (*Fidelity Federal Sav. & Loan Assn. v. De La Cuesta* (1982) 458 U.S. 141, 159-160 [102 S.Ct. 3014, 3025-3026, 73 L.Ed.2d 664] (*Fidelity Federal*).)

Congress gave the Federal Home Loan Bank Board (FHLBB) the following plenary authority to issue regulations governing federal savings and loans: " 'In order to provide local mutual thrift institutions in which people may invest their funds and in order to provide for the financing of homes, the [FHLBB] is authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, *operation*, and *regulation* of associations to be known as "Federal Savings and Loan Associations", or "Federal mutual savings banks" . . . , and to issue charters therefor, giving primary consideration to the best practices of local mutual thrift and home-financing institutions in the United States.' 12 U. S. C. § 1464(a)(1) (1976 ed., Supp. IV) (emphasis added)." (*Fidelity Federal, supra,* 458 U.S. at pp. 160-161 [102 S.Ct. at p. 3026].) Pursuant to this congressional delegation, the FHLBB enacted a complex scheme of regulations governing " 'the powers and operations of every Federal savings and loan association from its cradle to its corporate grave.' " (*Id.* at p. 145 [102 S.Ct. at p. 3018].)

In 1989, Congress enacted the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 (FIRREA), which abolished the FHLBB, created the OTS, and "placed the rights and duties formerly held by the FHLBB with OTS." (*Security Sav. & Loan v. Director, OTS* (5th Cir. 1992) 960 F.2d 1318, 1320-1321.) The FIRREA made the Director of OTS "responsible for the examination, supervision, and regulation of all federally insured savings associations" (*id.* at p. 1321, fn. 8), and gave the director the authority to prescribe such regulations "as the Director may determine to be necessary for carrying out" the HOLA. (12 U.S.C. § 1462a(b)(2).) OTS was given the same plenary power to issue regulations governing federal savings and loans that Congress had entrusted in the FHLBB. "In order to provide thrift institutions for the deposit of funds and for the extension of credit for homes and other goods and services, the [Director of the OTS] is authorized, under such regulations as the Director may prescribe— [¶] (1) to provide for the organization, incorporation, examination, operation, and regulation of

associations to be known as Federal savings associations (including Federal savings banks), and [¶] (2) to issue charters therefor, giving primary consideration of the best practices of thrift institutions in the United States. The lending and investment powers conferred by this section are intended to encourage such institutions to provide credit for housing safely and soundly." (12 U.S.C. § 1464(a).)

G. *12 Code of Federal Regulations section 560.2*

In 1996, OTS, pursuant to the broad rulemaking authority granted by the HOLA, promulgated 12 Code of Federal Regulations section 560.2 (2001) which provides as follows: "(a) *Occupation of field.* . . . To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provide in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision.

"(b) *Illustrative examples.* Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

"(1) Licensing, registration, filings, or reports by creditors;

"(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements;

"(3) Loan-to-value ratios;

"(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

"(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

"(6) Escrow accounts, impound accounts, and similar accounts;

"(7) Security property, including leaseholds;

"(8) Access to and use of credit reports;

"(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

"(10) Processing, origination, servicing, sale or purchasing of, or investment or participation in, mortgages;

"(11) Disbursements and repayments;

"(12) Usury and interest rate ceilings to the extent provided in 12 U.S.C. 1735f-7a and part 590 of this chapter and 12 U.S.C. 1463(g) and § 560.110 of this part; and

"(13) Due-on-sale clauses to the extent provided in 12 U.S.C. 1701j-3 and part 591 of this chapter.

"(c) *State laws that are not preempted.* State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

"(1) Contract and commercial law;

"(2) Real property law;

"(3) Homestead laws specified in 12 U.S.C. 1462a(f);

"(4) Tort law;

"(5) Criminal law; and

"(6) Any other law that OTS, upon review, finds:

"(i) Furthers a vital state interest; and

"(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section."

H. *OTS did not exceed its statutory authority in promulgating 12 Code of Federal Regulations section 560.2*

■ We first examine whether OTS exceeded its statutory authority in promulgating 12 Code of Federal Regulations section 560.2, or acted arbitrarily in so doing.

Title 12 Code of Federal Regulations section 560.2 was issued by OTS in 1996 as part of a "final rule updating, reorganizing, and substantially streamlining . . . lending and investment regulations and policy statements." (61 Fed.Reg. 50951 (Sept. 30, 1996).) These amendments were made "pursuant to the Regulatory Reinvention Initiative of the Vice President's National Performance Review (Reinvention Initiative) and section 303 of the Community Development and Regulatory Improvement Act of 1994 (CDRIA), which require[ed] OTS and the other federal banking agencies to review, streamline, and modify regulations and policies to improve efficiency, reduce unnecessary costs, and remove inconsistent, outmoded, and duplicative requirements." (*Ibid.*)

At the time 12 Code of Federal Regulations section 560.2 was issued, OTS advised that this "general lending preemption provision," was simply restating "long-standing preemption principles applicable to federal savings associations, as reflected in earlier regulations, court cases, and numerous legal opinions issued by OTS and the Federal Home Loan Bank Board (FHLBB), OTS's predecessor agency." (61 Fed.Reg. 50951, 50952 (Sept. 30, 1996).) The OTS noted that "[i]n those opinions, OTS has consistently taken the position that, with certain narrow exceptions, any state laws that purport to affect the lending operations of federal savings associations are preempted." (*Ibid.*) The OTS then cautioned, "[n]one of the changes implemented today should be construed as evidencing in any way an intent by OTS to change this long held position: OTS still intends to occupy the field of lending regulation for federal savings associations." (*Ibid.*) OTS expressed the belief that "the new lending preemption regulation is clearer and should significantly reduce the instances in which institutions need to request interpretive guidance from OTS." (*Ibid.*)

In creating a system of federal savings and loan associations, "Congress could have elected to subject the operation of federal associations to state law." (*Glendale Fed. Sav. & Loan Ass'n v. Fox, supra,* 459 F.Supp. at p. 909.) Instead, Congress gave the OTS "plenary authority over the creation and operation of federal associations." (*Ibid.*) As the HOLA makes clear, federal savings and loan associations are not to be operated and regulated by what a particular state conceives to be the "best practices." (*Ibid.*) "Rather,

the [OTS] was delegated by Congress the authority to select from the prevailing practices in all the states what it deemed the best practices and to prescribe a nationwide system of operation, supervision, and regulation which would apply to all federal associations." (*Ibid.*, fn. omitted.)

Title 12 United States Code section 1464(a), as amended, directs the OTS to give "primary consideration" to the "best practices of thrift institutions in the United States," and specifies that "[t]he lending and investment powers conferred by this section are intended to encourage such institutions to provide credit for housing safely and soundly." (12 U.S.C. § 1464(a).) This language evidences a clear congressional intent to delegate to the OTS complete authority to regulate federal savings and loan associations. While the language of 12 Code of Federal Regulations section 560.2 is sweeping, we conclude the OTS in promulgating this preemptive regulation exercised the kind of discretion that Congress intended to delegate to it in HOLA.

Our conclusion is consistent with federal banking agency preemption cases such as *Fidelity Federal.* That case involved a conflict between state and federal law regarding the validity of "due-on-sale" clauses in loans made by federal savings and loan associations. Due-on-sale clauses require a borrower to pay the outstanding balance of a debt if the property securing the debt is sold or transferred. (*Fidelity Federal, supra,* 458 U.S. at p. 145 [102 S.Ct. at p. 3018].) A regulation promulgated by the FHLBB (OTS's predecessor) provided that such clauses could be included in mortgage agreements. In the preamble accompanying final publication of the regulation, the FHLBB emphasized that federal savings and loan associations would not be bound by or subject to any conflicting state law that imposed different due-on-sale requirements. (*Id.* at p. 147 [102 S.Ct. at p. 3019].) Borrowers in California sued a federal savings and loan association asserting that its exercise of a due-on-sale clause violated California law. (*Id.* at pp. 148-149 [102 S.Ct. at pp. 3019-3020].) When the California Court of Appeal held that state law prevented enforcement of due-on-sale provisions between borrowers and federal savings and loan associations, the Supreme Court granted certiorari. (*Id.* at pp. 150-151 [102 S.Ct. at pp. 3020-3022].) In upholding the validity of the FHLBB's due-on-sale regulation, the *Fidelity Federal* court deferred to the FHLBB because of a convincing congressional delegation to the independent agency to regulate certain lending practices of federal savings and loans. The court concluded that the agency had exercised its power in a way that was not arbitrary or capricious, but was, in fact, reasonable. (*Fidelity Federal, supra,* 458 U.S. at pp. 160-169 [102 S.Ct. at pp. 3026-3031].) In reaching its conclusion, the court noted that Congress had "invested the [FHLBB] with broad authority to regulate federal savings and loans so as to effect the statute's purposes, and plainly indicated that the

[FHLBB] need not feel bound by existing state law." (*Id.* at p. 162 [102 S.Ct. at p. 3027].)

The *Federal Fidelity* court found that by directing the FHLBB to consider " 'the best practices of local mutual thrift and home-financing institutions in the United States,' " Congress "plainly envisioned that federal savings and loans would be governed by what the Board—not any particular State— deemed to be the 'best practices.' [Citations.]" (*Fidelity Federal, supra,* 458 U.S. at p. 161 [102 S.Ct. at p. 3026].) The court then concluded, "Thus, the statutory language suggests that Congress expressly contemplated, and approved, the [FHLBB's] promulgation of regulations superseding state law." (*Id.* at p. 162 [102 S.Ct. at p. 3027].)

While the *Fidelity Federal* majority opined that there were "no limits on the [FHLBB's] authority to *regulate the lending practices* of federal savings and loans" (*Fidelity Federal, supra,* 458 U.S. at p. 161 [102 S.Ct. at p. 3026], italics added), one justice concurred in the opinion for the sole purpose of emphasizing that "the authority of the Federal Home Loan Bank Board [predecessor to OTS] to pre-empt state laws is not limitless. Although Congress delegated broad power to the Board to ensure that federally chartered savings and loan institutions 'would remain financially sound,' . . . it is clear that HOLA does not permit the Board to pre-empt the application of all state and local laws to such institutions." (*Id.* at pp. 171-172 [102 S.Ct. at p. 3020] (conc. opn. of O'Connor, J.), fn. omitted.)

Section 560.2, of course, does not "preempt the application of all state and local laws" pertaining to federal savings and loans. We do not read the express preemption set forth in section 560.2 to mean that every state law having any conceivable connection to the lending operations of federal savings associations is preempted. Indeed, section 560.2 makes clear in paragraph (c) that there are some areas where the OTS has no right to regulate. (12 C.F.R. § 560.2(c) (2001).)

While the scope of 12 Code of Federal Regulations section 560.2 is broad and sweeping, we conclude that Congress intended to allow the OTS to promulgate such regulations in order to protect the integrity of federal savings and loans and to ensure that these associations conduct their operations in accordance with "best practices," so that credit will be extended "safely and soundly."

I. *Real parties in interest's state law claims are preempted by federal law*

██ We next consider whether the HOLA, as implemented by 12 Code of Federal Regulations section 560.2, preempts state law claims which allege

that a federal savings and loan association violates Section 2948.5, the UPA, and the Consumers Legal Remedies Act, in charging preclosing interest on home loans.

Real parties in interest contend that "the complete absence of OTS regulations on the issue of preclosing interest confirms that agency's implicit view that the issue lies outside the field of federal preemption." We disagree. Where, as here, the agency administering the federal act has expressed its intention to occupy the entire field of lending regulations for federal savings associations (12 C.F.R. § 560.2(a) (2001)) there is no need to find a specific regulation on point. (See *Wisconsin League of Financial Inst. v. Galecki* (W.D.Wis. 1989) 707 F.Supp. 401, 405 [in an action involving no conflicting federal regulation and finding preemption pursuant to the HOLA, "[u]nder the interpretation advanced by [the state of Wisconsin] the [OTS] would be required to affirmatively express by regulation every power held by a federal institution or risk restrictions by the states. Such an interpretation is based upon neither reason nor common sense"].) In addition, the OTS has stated that its silence is not an implicit endorsement of state laws regulating lending. (See 61 Fed.Reg. 50951, 50966 (Sept. 30, 1996) ["Failure to mention a particular type of state law that affects lending should *not* be deemed to constitute evidence of an intent to permit state laws of that type to apply to federal thrifts." (italics added)].)

Here, it is obvious that some measure of federal preemption is expressly indicated by 12 Code Federal Regulations section 560.2. The real question is the *extent* of the preemption. In 1998, OTS issued a regulation designed to assist in the preemption analysis. According to the OTS, "[w]hen analyzing the status of state laws under [section] 560.2, the first step will be to determine whether the type of law in question is listed in [section 560.2] paragraph (b). If so, the analysis will end there; the law is preempted." (61 Fed.Reg. 50951, 50966 (Sept. 30, 1996).)[5]

Paragraph (b) of 12 Code of Federal Regulations section 560.2 contains a list of examples of state laws preempted by the HOLA. "Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose regulations regarding: [¶] . . . [¶] (4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be

---

[5]"An agency's construction of its own regulations is entitled to substantial deference." (*McDaniel v. Chevron Corp.* (9th Cir. 2000) 203 F.3d 1099, 1115.)

called due and payable upon the passage of time or a specified event external to the loan."[6]

It is clear that what real parties in interest complain of is the amount of interest charged over the life of the loan, and the timing of the disbursal of loan proceeds. Charging interest and disbursing loan proceeds, we conclude, fall within the category of "terms of credit" as that phrase is used in paragraph (b)(4) of 12 Code of Federal Regulations section 560.2. The date interest begins to accrue and who pays it are as much terms of credit as "deferral and capitalization of interest and adjustments to the interest rate, balance, payment due, or term to maturity" (12 C.F.R. § 560.2(b)(4)) since all of these items center around the essential reason lenders issue home loans, to wit, charging and collecting interest.

We find that preemption of state law claims, premised on the theory that the charging of preclosing interest by a federal savings and loan association is unlawful, is explicit by virtue of the provisions of 12 Code of Federal Regulations section 560.2 which expressly preempts any state law governing the lending operations of a federal savings institution. Accordingly, we conclude that the trial court's order overruling Washington Mutual's demurrers to those causes of action contained within the Guilford and Talley complaints alleging violations of Section 2948.5, the UPA, and the Consumers Legal Remedies Act must be set aside.[7]

## J. Section 2948.5

 Washington Mutual contends that by its terms Section 2948.5 does not apply to loan proceeds deposited into an escrow account by a wire or electronic transfer. Real parties in interest disagree and contend that section 2948.5 does not expressly exempt a wire or electronic transfer.

 When called upon to interpret statutory language, we must ascertain the Legislature's intent so as to effectuate the purpose of the law. (*United Farm Workers of America v. Dutra Farms* (2000) 83 Cal.App.4th 1146, 1154 [100 Cal.Rptr.2d 251].) "To determine the Legislature's intent, we first

---

[6]Real parties in interest claim that California's prohibition against the charging of preclosing interest set forth in Section 2948.5 falls within the exception to preemption contained in 12 Code of Federal Regulations section 560.2(c)(2). Paragraph (c), however, is relevant only if paragraph (b) does not apply.

[7]Washington Mutual, contending that each of the causes of action contained within the Guilford and Talley complaints is based on a violation of Section 2948.5, urges this court to dismiss both complaints. However, the record reveals that not all of the causes of action contained within the complaints are premised solely on a violation of Section 2948.5. We express no opinion as to what allegations would suffice to render the complaints sufficient. This is an issue to be argued in the trial court.

examine the words of the statute, making sure that we give the language its usual and ordinary meaning. We must read the statutory words in context, consider the nature and purpose of the statutory enactment, and not view sentences in isolation but analyze them in light of the statutory scheme. [Citation.]" (*Id.* at p. 1155.) We are required to construe the statute so as to carry out the intent of the Legislature and to make the statute workable where possible. (*Ibid.*; *Henslee v. Department of Motor Vehicles* (1985) 168 Cal.App.3d 445, 452 [214 Cal.Rptr. 249] [a " 'statute must be read in light of both the objective it seeks to achieve and the evil it seeks to avert' "].)

Section 2948.5 provides that "[i]nterest on the principal obligation of a promissory note secured by a mortgage or deed of trust on real property improved with one-to-four residential dwelling units shall not commence to accrue prior to close of escrow if the loan proceeds are paid into escrow or, if there is no escrow, the date upon which the loan proceeds have been made available for withdrawal as a matter of right, as specified in subdivision (d) of Section 12413.1 of the Insurance Code. [¶] This section does not apply if the loan proceeds are paid or made available, as the case may be, in cash or by a check, cashier's check, negotiable order of withdrawal, share draft, traveler's check, or money order issued by, or drawn on, a financial institution, the accounts of which are insured by an agency or instrumentality of the United States, and which has an office in this state from which payment may be obtained." (As amended by Stats. 1990, ch. 872, § 1, p. 3694; see fn. 2, *ante.*)

The first paragraph of Section 2948.5 specifies the earliest time at which interest may commence to accrue in two different situations: (1) where loan proceeds are paid into escrow, and (2) where loan proceeds are delivered by any means other than through an escrow. The second paragraph provides that the limitations in the first paragraph do not apply if loan proceeds are "paid or made available" in cash or other types of instruments listed in the second paragraph.

■ Washington Mutual concedes that wire and electronic transfers are not listed in the second paragraph of Section 2948.5, but contends that because such transfers "represent cash," the limitations set forth in the first paragraph are inapplicable. Real parties in interest, on the other hand, contend that wire and electronic transfers are different from cash, and that the Legislature deliberately omitted such transfers from its list of exempted methods of payment, in order to effectuate its intent that lenders not be allowed to charge interest prior to the close of escrow.

Real parties in interest, in support of their conclusion concerning the Legislature's intent, point to Insurance Code section 12413.1, subdivision (c), which was enacted at the same time that Civil Code section 2948.5 was

amended, and which provides that "[f]unds deposited by cash or by electronic payment may be disbursed following deposit on the same business day as the business day of deposit." The point, apparently, is that because wire and electronic transfers are easily manageable, they can be sent on the same day escrow closes. We recognize the point. However, the fact that the Legislature grouped "cash" and "electronic payment" together in Insurance Code section 12413.1 suggests that the Legislature, too, views wire and electronic transfers as the equivalent of cash.

At the time the Legislature was contemplating the passage of Section 2948.5 and Insurance Code section 12413.1, it clearly was aware of wire and electronic transfers. A report to the Assembly Committee on Finance and Insurance noted, "[t]o the extent that a lender has used a wire transfer, their exemption from the prohibition on interest appears to be a non-issue since the funds are effectively conveyed to the borrowers use." (Assem. Com. on Fin. and Ins., Rep. on Assem. Bill No. 4267 (1989-1990 Reg. Sess.) May, 8, 1990, p. 1.) The report also noted that "[a]s a matter of public policy, if the loan is funded by delivery of cash, or what would be more common a wire transfer (so that they actually have moved the dollars out of their institution), it does not appear unreasonable that interest on such funds would be sought even when a weekend intervenes prior to the close of escrow." (*Ibid.*) From these comments, it appears that those charged with reporting to the Legislature on the proposed legislation viewed wire and electronic transfers as a method of delivering cash to the escrow holder. We, too, hold this view.

The common meaning of the word "cash" is "ready money," or "money or its equivalent (as a check) paid for good or services at the time of purchase or delivery." (Webster's 10th Collegiate Dict. (1999) p. 177.) Our courts have defined the term "cash" as " 'current money in hand or readily available,' " and as " ' "ready money" at command, subject to free disposal; not tied up in a fixed state.' " (*Estate of Chamberlain* (1941) 46 Cal.App.2d 16, 20 [115 P.2d 235].) The electronic transfer of funds from one bank to another has been characterized as the equivalent of transferring money. (*U.S. v. Goldberg* (3d Cir. 1987) 830 F.2d 459, 466.) "It is a fact of life in today's highly computerized and technological society that transfers of money between accounts are generally accomplished electronically. It is difficult to imagine a bank, that is directed by a customer to transfer [money] from the customer's account in [a particular location] to another account in [another location], doing it any other way than electronically. Does one take cash out of the first account, load it onto a truck and transport it to the bank in [the other location]? Obviously not." (*Ibid.*) " 'The beginning of the transaction is money in one account and the ending is money in another. The manner in

which the funds were moved does not affect the ability to obtain tangible paper dollars or a bank check from the receiving account. Indeed, we suspect that actual dollars rarely move between banks.' " (*Id.* at p. 467, citing *United States v. Gilboe* (2d Cir. 1982) 684 F.2d 235, 238.)

Other courts have made the same observations. In *Banque Worms v. BankAmerica Intern.* (1991) 77 N.Y.2d 362 [568 N.Y.S.2d 541, 570 N.E.2d 189], the court noted that "[e]lectronic funds transfers have become the preferred method utilized by businesses and financial institutions to effect payments and transfers of a substantial volume of funds. These transfers, commonly referred to as wholesale wire transfers, differ from other payment methods in a number of significant respects, a fact which accounts in large measure for their popularity. Funds are moved faster and more efficiently than by traditional payment instruments, such as checks. The transfers are completed at a relatively low cost, which does not vary widely depending on the amount of the transfer, because the price charged reflects primarily the cost of the mechanical aspects of the funds transfer. [Citation.] Most transfers are completed within one day and can cost [very little] to carry out a multimillion dollar transaction." (*Id.* at pp. 369-370 [568 N.Y.S.2d at pp. 545-546, 570 N.E.2d at pp. 193-194], fn. omitted.)

It is doubtful our Legislature envisioned that lenders would disburse proceeds of home loans by physically delivering large sums of cash to escrow offices. The more sensible interpretation of the word "cash" is that lenders would make cash disbursements via wire transfers, as is commonly done in the lending industry.

So, why did the Legislature fail to include wire and/or electronic transfers in its list of exempted payment methods? Real parties in interest claim that the Legislature exempted cash, checks and money orders because these methods, unlike wire and electronic transfers, "have to be prepared and delivered to an escrow holder in advance of closing." According to real parties, because funds transferred electronically are "immediately available, there is no reason to transfer them in advance or prior to the close of escrow, and no reason to begin charging borrowers interest until the day the escrow closes." What real parties contend, in essence, is that little or no preparation is required before a lender transmits funds into escrow by wire transfer. This position, we believe, fails to address the realities of business life.

Electronic funds transfers are popular because of their low cost and ease of transmission, and "this is so even though banks executing wire transfers often risk significant liability as a result of losses occasioned by mistakes and errors, the most common of which involve the payment of funds to the wrong beneficiary or in an incorrect amount." (*Banque Worms v. Bank-America Intern., supra,* 77 N.Y.2d at p. 370 [568 N.Y.S.2d at p. 546, 570

N.E.2d at p. 194].) This suggests that lenders should not rush the wire transfer process; that the lender should follow established procedures and security measures in order to prevent losses. We find nothing unreasonable in allowing a lender to transmit funds one business day prior to the close of escrow in order to allow the lender time within which to ensure its information is accurate, and to allow the escrow holder sufficient time after the funds are received to perform necessary tasks prior to the close of escrow.[8]

The legislative history of Section 2948.5 shows that the proposed legislation was sponsored by the California Association of Realtors, which took the position that a law was "needed because current law and check processing practices delay the close of escrow and thus inconvenience borrowers and sellers." (Enrolled Bill Rep., analysis of Sen. Bill No. 1223 (1985-1986 Reg. Sess.) Sept. 25, 1985, p. 1.) The association advised the Legislature that "lenders use checks drawn on, or issued by, out-of-state financial institutions or use loan servicing businesses which use out-of-state checks. Lenders and the loan servicing businesses get the benefit of the 'float' or use of the loaned funds during the period of time that it takes for the check to clear. The period of time is greater for out-of-state institutions than for checks drawn on or issued by California institutions. This longer float is the reason that out-of-state financial institutions are used to issue the checks." (*Ibid.*) The association concluded that "it is entirely fair that the lender get his or her interest from the borrower for the period of time for which the borrower has the use of the money, and not get bonus interest because of a situation which the lender may have contrived to get both the interest from the borrower and the float on a check issued to the borrower for the loan." (California Association of Realtors, letter to Vaun Wilmott re Sen. Bill No. 1223 (1985-1986 Reg. Sess.) May 24, 1985.)

Real parties in interest contend that the Legislature enacted Section 2948.5 in order to ensure that lenders act responsibly in dealing with escrows and borrowers. We agree. However, we are not convinced that the Legislature enacted Section 2948.5 with the specific intent of barring a lender from charging a borrower interest on a mortgage loan one business day prior to the close of escrow. The Legislature's purpose in enacting Section 2948.5 was to prevent lenders from earning "double interest," and in order to accomplish its goal, the Legislature included language specifying the earliest time at which interest may commence to accrue. The Legislature also included language providing that it is only when funds are "paid or made available" to a borrower, that the lender is entitled to charge interest. By its

---

[8]Our conclusion is consistent with a section of the California Residential Mortgage Lending Act, which became effective January 1, 2001, and which provides that a licensee may not "[r]equire a borrower to pay interest on the mortgage loan for a period in excess of one day prior to recording of the mortgage or deed of trust." (Fin. Code, § 50204, subd. (*o*).)

inclusion of the word "cash" in the list of exempted payment methods, the Legislature expressed its opinion that when a lender disburses cash into an escrow, the funds are "available" for the borrower's use.

In 1999, the California Department of Financial Institutions, in a letter to the Office of the California Attorney General, stated its "view that Section 2948.5 of the Civil Code does not prohibit interest from accruing on a loan prior to the close of escrow if the lender pays into escrow readily available funds." There is no question that funds disbursed via electronic or wire transfer are "readily available funds." (See Miller & Starr, Cal. Real Estate (2d ed. 1975) § 5:25, p. 460 ["Cash, a cashier's or certified check, or a wire transfer of funds would be considered as ready funds." (fn. omitted)].)

We conclude that the word "cash," as that word is used in Section 2948.5 includes a wire or electronic transfer because such transfers are the functional equivalent of cash. Given our conclusion, it follows that Washington Mutual's demurrers to those causes of action contained within the Guilford and Talley complaints that are based solely on Section 2948.5 should have been sustained without leave to amend.

## IV. DISPOSITION

Let a peremptory writ of mandate issue directing the superior court to set aside its order overruling petitioner's demurrers, and to issue a new and different order sustaining without leave to amend petitioner's demurrers to those causes of action asserting a violation of Section 2948.5, and to sustain with leave to amend those causes of action asserting violations of the UPA, and the Consumers Legal Remedies Act. The temporary stay is vacated, and the order to show cause is dismissed. Petitioner to recover the costs of this petition.

Nott, J., and Cooper, J.,* concurred.

On February 15, 2002, the opinion was modified to read as printed above.

---

*Presiding Justice of the Court of Appeal, Second Appellate District, Division Eight, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.