PINCHOT, APPELLEE, *v.* CHARTER ONE BANK, F.S.B., APPELLANT.

[Cite as *Pinchot v. Charter One Bank, F.S.B.,*
99 Ohio St.3d 390, 2003-Ohio-4122.]

(No. 2002–0945—Submitted May 13, 2003—Decided August 20, 2003.)

ALICE ROBIE RESNICK, J.

{¶ 1} In July 1997, plaintiff-appellee Michael J. Pinchot obtained a loan from defendant-appellant Charter One Bank, F.S.B. ("Charter One"). The loan was evidenced by a promissory note and secured by a mortgage lien on Pinchot's residence in Parma, Ohio. At all relevant times, Charter One was a federal savings association organized under the Home Owners' Loan Act ("HOLA") (originally, the Home Owners' Loan Act of 1933), Section 1461 et seq., Title 12, U.S.Code.

{¶ 2} Pinchot fully satisfied his mortgage on December 31, 1998. Charter One, through an agent subsidiary corporation, recorded the fact of the satisfaction in the Cuyahoga County Recorder's Office on April 27, 1999, which was 117 days after the satisfaction. Pinchot brought this action on behalf of himself and a class of persons similarly situated pursuant to R.C. 5301.36, which provides that if the mortgagee of a residential mortgage fails to record the satisfaction within 90 days, the mortgagor may recover damages of $250 in a civil action.

{¶ 3} Charter One moved for summary judgment on grounds that R.C. 5301.36, as applied to federal savings associations, is preempted by Section 560.2, Title 12, C.F.R., which was promulgated by the Department of the Treasury, Office of Thrift Supervision ("OTS") pursuant to its authority under Sections 4(a) and 5(a)

of the HOLA, Sections 1463(a) and 1464(a), Title 12, U.S.Code. Pinchot moved for partial summary judgment on his claim for $250 in statutory damages, arguing that Section 560.2 permits the application of R.C. 5301.36 to federal mortgage lenders. Without opinion, the trial court granted Charter One's motion for summary judgment, denied Pinchot's motion for partial summary judgment, and overruled Pinchot's motion for class certification as moot.

{¶ 4} Finding that federal law does not preempt the application of R.C. 5301.36 to federal savings associations, the court of appeals reversed the summary judgment of the trial court and remanded the cause with instructions for the trial court to enter partial summary judgment in Pinchot's favor and to consider Pinchot's request for class certification.

{¶ 5} The cause is now before this court pursuant to the allowance of a discretionary appeal.

{¶ 6} We are asked to decide whether Section 560.2, Title 12, C.F.R. preempts the application of R.C. 5301.36 to federal savings associations.[1]

{¶ 7} The HOLA grew out of the Great Depression of the 1930s. It was "intended 'to provide emergency relief with respect to home mortgage indebtedness' at a time when as many as half of all home loans in the country were in default. H.R. Conf. Rep. No. 210, 73d Cong., 1st Sess., 1 (1933). Local institutions that had previously supplied funds to finance homes had ceased doing business or had discontinued such long-term loans, so that more than half the counties in the country, containing almost one-fifth of the total population, were without home financing institutions.

{¶ 8} "In order to ameliorate these conditions, Congress enacted the HOLA, 'a radical and comprehensive response to the inadequacies of the existing state systems.' *Conference of Federal Sav. & Loan Assns. v. Stein,* 604 F.2d 1256, 1257 (C.A.9 1979), summarily aff'd, 445 U.S. 921 [100 S.Ct. 1304, 63 L.Ed.2d 754] (1980). The Act provided for the creation of a system of federal savings and loan associations, which would be regulated by the Board [Federal Home Loan Bank Board] so as to ensure their vitality as 'permanent associations to promote the thrift of the people in a cooperative manner, to finance their homes and the homes of their neighbors.' S.Rep. No. 91, 73d Cong., 1st Sess., 2 (1933)." (Citations omitted.) *Fid. Fed. S. & L. Assn. v. de la Cuesta* (1982), 458 U.S. 141, 160, 102 S.Ct. 3014, 73 L.E.2d 664.

---

1. As a matter of jurisdiction, Pinchot contends that the court should dismiss this appeal because the Attorney General was not notified of a constitutional challenge as required by R.C. 2721.12(A). However, since this case is not a declaratory judgment action filed pursuant to R.C. Chapter 2721, service on the Attorney General is not required as a prerequisite to invoking the court's jurisdiction. *Cleveland Bar Assn. v. Picklo,* 96 Ohio St.3d 195, 2002-Ohio-3995, 772 N.E.2d 1187, ¶ 7.

{¶ 9} Congress gave the FHLBB plenary authority to regulate "the organization, incorporation, examination, operation, and regulation of [federal savings and loan] associations." Former Section 1464(a)(1), Title 12, U.S.Code, Section 5(a) of HOLA, 48 Stat. 132. Pursuant to this authority, the FHLBB promulgated a uniform scheme of regulations governing " 'the powers and operations of every Federal savings and loan association from its cradle to its corporate grave.' " *Fid. Fed.*, 458 U.S. at 145, 102 S.Ct. 3014, 73 L.Ed.2d 664, quoting *People v. Coast Fed. S. & L. Assn.* (D.Cal.1951), 98 F.Supp. 311, 316.

{¶ 10} In 1989, the HOLA was amended by the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), which dissolved the FHLBB and transferred its powers and duties to the OTS. Under the FIRREA, the director of OTS was given the same plenary power to prescribe regulations for carrying out the HOLA that was formerly entrusted to the FHLBB. See Sections 1462a(b)(2) and 1464(a), Title 12, U.S.Code.

{¶ 11} Effective October 30, 1996, OTS promulgated Section 560.2, Title 12, C.F.R., which declares preemption of state lending regulations:

{¶ 12} "(a) *Occupation of field.* * * * To enhance safety and soundness and to enable federal savings associations to conduct their operations in accordance with best practices (by efficiently delivering low-cost credit to the public free from undue regulatory duplication and burden), OTS hereby occupies the entire field of lending regulation for federal savings associations. OTS intends to give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section or § 560.110 of this part. For purposes of this section, 'state law' includes any state statute, regulation, ruling, order or judicial decision.

{¶ 13} "(b) *Illustrative examples.* Except as provided in § 560.110 of this part, the types of state laws preempted by paragraph (a) of this section include, without limitation, state laws purporting to impose requirements regarding:

{¶ 14} "* * *

{¶ 15} "(4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

{¶ 16} "(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing fees, and overlimit fees;

{¶ 17} "* * *

{¶ 18} "(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

{¶ 19} "* * *

{¶ 20} "(c) *State laws that are not preempted.* State laws of the following types are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations or are otherwise consistent with the purposes of paragraph (a) of this section:

{¶ 21} "(1) Contract and commercial law;

{¶ 22} "(2) Real property law;

{¶ 23} "* * *

{¶ 24} "(6) Any other law that OTS, upon review, finds:

{¶ 25} "(i) Furthers a vital state interest; and

{¶ 26} "(ii) Either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section."

{¶ 27} In its policy guidelines, the OTS suggests that courts utilize the following paradigm to determine whether a law is preempted by Section 560.2:

{¶ 28} "When analyzing the status of state laws under § 560.2, the first step will be to determine whether the type of law in question is listed in paragraph (b). If so, the analysis will end there; the law is preempted. If the law is not covered by paragraph (b), the next question is whether the law affects lending. If it does, then, in accordance with paragraph (a), the presumption arises that the law is preempted. This presumption can be reversed only if the law can clearly be shown to fit within the confines of paragraph (c). For these purposes, paragraph (c) is intended to be interpreted narrowly. Any doubt should be resolved in favor of preemption." 61 F.R. 50951, 50966–50967.

{¶ 29} The parties have raised a number of arguments that concern the appropriate method of analysis in this case. Since these arguments revolve around the validity and proper application of the above guideline, we will deal with them first.

{¶ 30} Pinchot contends that the OTS's suggested method of analysis is inconsistent with the regulation. He points out that the guideline was "never published as a regulation" and argues that the first two sentences of "the above language * * * can't be right because then there could never be a 12 C.F.R. 560.2(c) exception to preemption." Pinchot essentially reasons that the guideline forbids a state law covered under paragraph (b) to escape preemption under paragraph (c). But, according to the regulation, he argues, a state law described in paragraph (b) can escape preemption by fitting into one of the exceptions

under paragraph (c). Thus, the guideline prohibits what the regulation prescribes. We disagree.

{¶ 31} While the OTS guidelines are "not [to be] treated in the same manner as binding regulations," 61 F.R. at 50952, we find no inconsistency between this guideline and the regulation. Under paragraph (a) of section 560.2, "state laws purporting to regulate or otherwise affect" the credit activities of federal savings associations are preempted "except to the extent provided in paragraph (c) * * * or § 560.110." Paragraph (b) of Section 560.2 provides a nonexhaustive list of the types of state laws that are preempted under paragraph (a). However, paragraph (b) is not a mere sampling of state laws that purport to regulate or otherwise affect the lending activities of federal thrifts. It is a sampling of state laws that are *"preempted* by paragraph (a)," meaning laws that are not saved from preemption under paragraph (c). (Emphasis added.) It seems reasonably clear that the OTS has established the list in paragraph (b) as a sort of predetermination that state laws of this type are beyond the boundaries of paragraph (c) and, therefore, are not saved from preemption. In other words, the categories of lending activities that are set forth in paragraph (b) are deemed to be outside the permissible regulatory scope of state contract, commercial, real property, tort, and criminal law for purposes of federal lending.

{¶ 32} Pinchot also claims that there is a general presumption against the federal invasion of core state functions. Thus, any preemption analysis must begin with the assumption that the historic police powers of the states are not to be superseded by federal law, especially in areas traditionally governed by state law, such as the security of titles to real estate.

{¶ 33} The cases upon which Pinchot relies do establish a general presumption against federal preemption. But they also reveal that the presumption is designed to protect the states against *unintended* federal encroachment on their traditional authority. The presumption against preemption is just that—a presumption—and it does not apply where the clear and manifest purpose of the statute or, in this case, regulation is to the contrary. Thus, when the examined federal law contains an express preemption clause, as is the case with Section 560.2, the question of state-law displacement depends in the first instance not upon any presumption but upon the text of that clause. See *Minton v. Honda of Am. Mfg., Inc.* (1997), 80 Ohio St.3d 62, 68–70, 684 N.E.2d 648; *Jenkins v. James B. Day & Co.* (1994), 69 Ohio St.3d 541, 544–545, 634 N.E.2d 998; *In re Miamisburg Train Derailment Litigation* (1994), 68 Ohio St.3d 255, 260, 626 N.E.2d 85; *BFP v. Resolution Trust Corp.* (1994), 511 U.S. 531, 544, 114 S.Ct. 1757, 128 L.Ed.2d 556.

{¶ 34} On the other hand, we also reject Charter One's contention that in determining "whether recording a mortgage satisfaction falls within one of the

categories set forth in Paragraph (b), the court [is] required to resolve any doubt in favor of preemption." The regulation is devoid of presumptive language and the guideline does not call for any presumption or resolution of doubt in favor of preemption at the stage of determining coverage under paragraph (b). Under the guideline, these interpretive devices do not come into play unless the court reaches the question of coverage under paragraph (c), that is, after a determination is made that "the law is not covered by paragraph (b)" and that "the law affects lending." There is no guiding directive that a particular state law is presumed to correspond to those laws delineated in paragraph (b) or to affect lending.

{¶ 35} As a final matter pertaining to the application of the guideline, Charter One maintains that the court of appeals "conduct[ed] its analysis backwards." In other words, "[r]ather than beginning its analysis with Paragraphs (a) and (b) of the regulation, as the OTS intended, the court of appeals *first* decided, under Paragraph (c), that in its view R.C. 5301.36 was consistent with the 'best practices' of thrift institutions." (Emphasis sic.) Thus, "the court began with the exceptions to the rule and not the rule itself."

{¶ 36} This argument, though strongly urged as a ground for reversal, is unavailing. The court of appeals separately considered Charter One's claim that "the recording statute is included as part of loan 'servicing' under Section 560.2(b)(10), Title 12, C.F.R. and thus is expressly and irrefutably preempted." The court specifically rejected this argument, finding that "[t]he recording of real property transactions cannot be described as merely loan servicing" and that "the recording statute is unlike any of the other lending regulations discussed in Section 560.2(b)." The court then concluded that R.C. 5301.36 "is not preempted by Section 560.2(b)(10)." Thus, the order in which the court of appeals conducted its analysis is of no consequence.

{¶ 37} Having decided that both the OTS's guideline and the court of appeals' approach are consistent with the regulation, we now proceed to consider in the first instance whether R.C. 5301.36 matches any of the laws delineated in Section 560.2(b). R.C. 5301.36 imposes requirements regarding the recording of mortgage satisfactions.[2] However, paragraph (b) of Section 560.2 does not specifically

---

2. {¶ a} R.C. 5301.36 provides:

{¶ b} "(B) Within ninety days from the date of the satisfaction of a residential mortgage, the mortgagee shall record the fact of the satisfaction in the appropriate county recorder's office and pay any fees required for the recording. The mortgagee may, by contract with the mortgagor, recover the cost of the fees required for the recording of the satisfaction by the county recorder.

{¶ c} "(C) If the mortgagee fails to comply with division (B) of this section, the mortgagor may recover, in a civil action, damages of two hundred fifty dollars. This division does not preclude or affect any other legal remedies that may be available to the mortgagor.

mention state laws pertaining to the recording of mortgage satisfactions or to the filing of mortgage releases or discharges. Thus, Charter One argues that "recording a mortgage satisfaction is a 'loan servicing' or 'loan origination' function under Section 560.2(b)(10)."

{¶ 38} In support of this contention, Charter One argues, "The undisputed evidence in this case establishes that the recording of a mortgage satisfaction is either a loan 'servicing' or loan 'origination' function. Indeed, all five of the experts in this case—*three of whom testified on behalf of plaintiff*—testified that the recording of a mortgage satisfaction is a loan servicing or loan origination function." (Emphasis sic.)

{¶ 39} It is axiomatic, however, that preemption, particularly under the HOLA and its implementing regulations, is a question of law. See *Washington Mut. Bank, F.A. v. Superior Court of Los Angeles Cty.* (2002), 95 Cal.App.4th 606, 612, 115 Cal.Rptr.2d 765. Otherwise, any given issue of preemption, such as R.C. 5301.36's application to federal mortgage lenders, could be decided differently from case to case depending on the testimony of expert witnesses. A particular state recording or other statute might then be found preempted in one case only to be applied in another pursuant to differing panels of experts. It goes without saying that such a potential hodgepodge of varying and inconsistent factual decisions would in no small way disrupt the very purpose of preemption to attain uniformity, soundness, and stability in a federal scheme of lending regulation.

{¶ 40} As for legal authority that the recording of a mortgage satisfaction can be properly classified as loan or mortgage origination, Charter One offers none. We reject out of hand any definition of loan or mortgage "origination" that would encompass an activity that necessarily occurs after the debt is satisfied.

{¶ 41} In support of its alternate contention that the recording of a mortgage satisfaction is a loan-servicing function, Charter One asserts that "the OTS has itself issued two opinion letters that make clear that state laws purporting to regulate a federal lender's handling of a mortgage payoff statement are preempted by 560.2(b)." Specifically, these opinions involve bank fees that are charged for the preparation and faxing of payoff or demand statements. A payoff or demand statement is a recitation of all outstanding amounts on an existing mortgage, including principal and accrued interest as of a specific date and the per diem interest charges accruing after that date. The OTS considers these charges to be "loan-related fees" under the coverage of Section 560.2(b)(5). See

{¶ d} "(D) As used in this section, 'residential mortgage' means an obligation to pay a sum of money evidenced by a note and secured by a lien upon real property located within this state containing two or fewer residential units or on which two or fewer residential units are to be constructed and shall include such an obligation on a residential condominium or cooperative unit."

2000 OTS Op. No. P–2000–6 (Apr. 21, 2000), 2000 WL 1455751; 1999 OTS Op. No. P–99–3 (Mar. 10, 1999).

{¶ 42} In addition, Charter One asserts that "two recent decisions based on closely analogous facts demonstrate that R.C. 5301.36 is preempted." In *Moskowitz v. Washington Mut. Bank, F.A.* (2002), 329 Ill.App.3d 144, 263 Ill.Dec. 502, 768 N.E.2d 262, it was held, in accord with the OTS opinions, that a payoff statement is a "loan-related fee" as listed in Section 560.2(b)(5). Charter One emphasizes that in finding the plaintiff's breach-of-contract claim preempted, the court in *Moskowitz* stated that "the OTS has described the payoff statement as 'an *integral* part of the lending process' (emphasis added)." Id., 329 Ill.App.3d at 149, 263 Ill.Dec. 502, 768 N.E.2d 262, quoting 2000 OTS Op. No. P–2000–6. In *Washington Mut. Bank, F.A. v. Superior Court of Los Angeles Cty.*, supra, 95 Cal.App.4th at 621, 115 Cal.Rptr.2d 765, the charging of preclosing interest was held to "fall within the category of 'terms of credit' as that phrase is used in paragraph (b)(4) of * * * section 560.2."

{¶ 43} These decisions are not only distinguishable for the reason that they have nothing to do with the issue of mortgage-servicing under Section 560.2(b)(10), but they actually draw on certain principles that are ultimately incompatible with Charter One's position. In 2000 OTS Op. No. P–2000–6 (Apr. 21, 2000), 2000 WL 1455751, upon which the court in *Moskowitz* relied, the OTS explained that "[t]he payoff statement is an integral part of the lending process *as it provides the information necessary to satisfy the debt and extinguish the extension of credit.*" (Emphasis added.) In *Washington Mut. Bank v. Superior Court*, 95 Cal.App.4th at 621, 115 Cal.Rptr.2d 765, the court explained, "The date interest begins to accrue and who pays it are as much terms of credit as 'deferral and capitalization of interest and adjustments to the interest rate, balance, payment due, or term to maturity' (12 C.F.R. § 560.2(b)(4)) *since all of these items center around the essential reason lenders issue home loans, to wit, charging and collecting interest.*" (Emphasis added.)

{¶ 44} Similarly, in a 1995 memorandum opinion, 1995 WL 550754 (May 10, 1995), the OTS explained:

{¶ 45} "We have found no evidence that the OTS lending regulations were intended to preempt state laws requiring lenders to collect loan-related taxes from borrowers. * * * [S]tate tax collection laws are different in kind from the types of state laws intended to be preempted by the lending regulations. [However,] [t]he provisions of the [Georgia Residential] Mortgage Act that attempt to impose requirements regarding escrow accounts, disclosure, advertising, books and records, registration, and lender fees [all of which are listed in Section 560.2(b)] are classic examples of the types of state laws that fall within the scope of OTS lending regulation preemption. Each of these state laws

relates to lending practices and to the operations of savings associations, *i.e., whether and how loans are made.*" (Emphasis added.)

{¶ 46} These decisions underscore that Section 560.2(b), though broadly constructed to fill in much of the sphere of regulatory preemption, is still embedded within the functional boundaries of lending and credit-related activity. In our opinion, it would constitute an unwarranted extension of those boundaries were this court to find that the recording of mortgage satisfactions is a lending or credit-related function auxiliary to the "servicing" of mortgages under Section 560.2(b)(10). The recording of a mortgage satisfaction or real estate lien release is not an integral part of the lending process, as it occurs after the debt is satisfied and the extension of credit is extinguished. Such a recording requirement cannot even begin until the mortgage has already been terminated. It does not center around the essential reasons lenders issue home loans, for it has nothing to do with charging and collecting interest or any other lending or credit-related function. And such a recording requirement cannot be realistically connected to lending practices or to the operations of savings associations because it has no concrete significance to whether and how loans are made. The mortgage is taken to secure the loan and filed to perfect the lien. When the loan is paid, the mortgage is satisfied, leaving a cloud on the title to the realty until the satisfaction is recorded. There is nothing in either the lending regulations themselves or in the regulatory history to indicate that the OTS intended to occupy the field of clearing real estate titles, much less to include the filing of notices of mortgage satisfactions within the preempted category of mortgage servicing under Section 560.2(b)(10).

{¶ 47} Charter One also cites the Comptroller's Handbook published by the Office of the Comptroller of the Currency ("OCC"), which regulates national banks, as evidence that the recordation of a mortgage satisfaction is a servicing function for purposes of Section 560.2(b)(10). 1996 WL 652822. The handbook classifies mortgage banking under four major areas of activities, each of which is normally performed by a separate unit or department of the bank. One of these areas involves servicing activities. Charter One points out that the handbook lists "loan setup and payoff" as a servicing function, id. at * 13, and goes on to state, "The payoff unit is responsible for processing loan payoffs, including recording the mortgage satisfaction * * *." Id. at * 16.

{¶ 48} However, the fact that the Comptroller's Handbook places the recordation of mortgage satisfactions in the category of loan servicing for purposes of ensuring effectiveness of banking operations is of no consequence to whether the activity is covered under Section 560.2(b) for purposes of preemption. In fact, in the very next sentence in the handbook, which Charter One neglects to mention,

the OCC advises that "[f]ailure to process the mortgage satisfaction *in accordance with state law* may result in monetary fines." (Emphasis added.) Id.

{¶ 49} We conclude, therefore, that R.C. 5301.36 does not purport to impose requirements regarding the origination or servicing of mortgages for purposes of Section 560.2(b)(10), Title 12, C.F.R. Since the list in Section 560.2(b) is not exhaustive, however, a state law not specifically covered in paragraph (b) does not automatically escape preemption under the regulations. Thus, it must still be determined whether R.C. 5301.36 affects the credit activities of federal thrifts and, if so, whether it falls within the parameters of paragraph (c) of Section 560.2.

{¶ 50} Pinchot informs us that while all 50 states have some type of law pertaining to the recording of mortgage satisfactions, "[t]he OTS has never said mortgage satisfaction [recording] statutes are preempted." Pinchot also asserts that "neither the OTS nor any other federal authority has passed any laws or regulations governing [the recording of] mortgag[e] * * * satisfactions." Yet, as stated in 61 F.R. at 50965–50966, "in those instances where OTS has detected a gap in the federal protections provided to borrowers, the agency has promulgated regulations imposing additional consumer protection requirements on federal thrifts." According to Pinchot, this lack of regulatory interest in the recording of mortgage satisfactions "indicates that these laws are not preempted." We disagree.

{¶ 51} The failure on the part of OTS to regulate or specifically preempt a particular type of state law is neither determinative nor even probative of regulatory intent. "Where, as here, the agency administering the federal act has expressed its intention to occupy the entire field of lending regulations for federal savings associations * * * there is no need to find a specific regulation on point." *Washington Mut. Bank,* supra, 95 Cal.App.4th at 620, 115 Cal.Rptr.2d 765. "The drafters of the regulations were not required to anticipate and specifically describe each type of state law falling within the scope of regulatory preemption." May 10, 1995 OTS Memorandum Opinion, supra, 1995 WL 550754. Thus, the "[f]ailure to mention a particular type of state law that affects lending should *not* be deemed to constitute evidence of an intent to permit state laws of that type to apply to federal thrifts." (Emphasis sic.) 61 F.R. at 50966.

{¶ 52} "However, this does not mean that every state law having any conceivable connection to the lending operations of federal savings associations is preempted." May 10, 1995 OTS Memorandum Opinion, supra. See, also, *Washington Mut. Bank,* supra, 95 Cal.App.4th at 619, 115 Cal.Rptr.2d 765 ("We do not read the express preemption set forth in Section 560.2 to mean that every state law having any conceivable connection to the lending operations of federal savings associations is preempted"). Thus, in order to fall within the preemptive

scope of Section 560.2, the state law in question must at least bear a concrete, logical, or substantial relation to some aspect or function of lending.

{¶ 53} The only case cited by the parties that has any direct bearing on this issue is *Konynenbelt v. Flagstar Bank, F.S.B.* (2000), 242 Mich.App. 21, 617 N.W.2d 706. In that case, Flagstar Bank and a class of borrowers entered into mortgage agreements providing that "[u]pon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument without charge to Borrower." After the borrowers prepaid their mortgages, however, Flagstar sought to charge them a $9 recording fee, which was admittedly a reimbursement for the $9 fee charged by the register of deeds to record the discharge. In their complaint, plaintiff borrowers claimed that Flagstar had breached their mortgage agreements and violated Mich.Stat. 26.558(1) (MCL 565.41), which provides:

{¶ 54} "A mortgagee or his personal representative, successor or assign, within 90 days after a mortgage has been paid or otherwise satisfied and discharged, shall prepare and file a discharge thereof with the register of deeds for the county where the mortgaged property is located and pay the fee for recording the discharge."

{¶ 55} In ruling against preemption, the Michigan Court of Appeals concluded that the OTS did not really occupy the entire field of lending for federal thrifts, despite its stated intention to the contrary. But the court's conclusion in this regard, as Charter One puts it, was "not necessary to its decision." Regardless of whether the OTS's occupation of the field of lending is complete, it has not purported to occupy nonlending-related areas or to preempt state laws having no connection to lending. Thus, no matter how the conceptual interplay among the three divisions in Section 560.2 is perceived, the critical issue always becomes whether the challenged state law purports to regulate or otherwise affect the credit activities of federal savings associations. On this issue, the court essentially found that a state law requiring the mortgagee to file a discharge of mortgage within 90 days of satisfaction and to pay the recording fee "has nothing to do with the lending of money. The fee is charged after lending has occurred." Id., 242 Mich.App. at 34, 617 N.W.2d 706. The court's nonessential conceptual difficulties on the issue of field occupation have no bearing on this finding and, therefore, do not vitiate its decision.

{¶ 56} Since we have now determined that R.C. 5301.36 does not affect the lending operations of federal thrift institutions, there is no need to examine the exceptions in Section 560.2(c). A state law need not fall within the purview of paragraph (c) in order to escape preemption if it does not affect lending in the first place. However, even were we to assume that R.C. 5301.36 has some actual or substantive effect on the credit activities of federal savings associations, we

could not agree with Charter One's contention that R.C. 5301.36 falls outside the confines of Section 560.2(c).

{¶ 57} According to Charter One, "The costs associated with compliance with state recording statutes, standing alone, have more than an incidental effect on the lending operations of Charter One," which "has mortgages in 46 states." Charter One argues that R.C. 5301.36 is inconsistent with the "best practices" of federal thrift institutions because it would "allow the costs of credit to increase unnecessarily."

{¶ 58} We find it exceedingly difficult to take these arguments seriously, however, since Charter One not only undertook to complete the recording process in this case subject to a provision in the mortgage agreement requiring Pinchot to pay "any recordation costs," but actually informs us that its corporate subsidiary that records mortgage satisfactions "devotes substantial resources to its efforts to comply with Ohio's recording statute and the recording statutes of other states." Short of finding that Charter One has itself chosen to act in contravention of the best practices of federal thrifts, we agree with the court of appeals that "R.C. 5301.36 is intended to promote efficiency and certainty in clearing and transferring title in residential real property transactions, and is in all aspects consistent with the best practices of thrift institutions." It is, as the court of appeals explains, "a real property statute not only in name, but in purpose and effect, and has only an incidental effect on Charter One's lending practices."

{¶ 59} Finally, Charter One maintains that "even if R.C. 5301.36 were not preempted, it could only be enforced against Charter One by the OTS or the OCC." However, the cases on which Charter One relies forbid enforcement actions on behalf of the state or by a public official or regulatory body, not by private, individual customers.

{¶ 60} Based on all of the foregoing, we hold that Section 560.2, Title 12, C.F.R., as promulgated by the Office of Thrift Supervision pursuant to its authority under the Home Owners' Loan Act, Section 1461 et seq., Title 12, U.S.Code, does not preempt the application of R.C. 5301.36's mortgage-satisfaction recording requirements to federal savings associations.

{¶ 61} Accordingly, the judgment of the court of appeals is hereby affirmed, and the cause is remanded to the trial court for further proceedings.

Judgment affirmed
and cause remanded.

MOYER, C.J., F.E. SWEENEY, PFEIFER, SUNDERMANN, LUNDBERG STRATTON and O'CONNOR, JJ., concur.

J. HOWARD SUNDERMANN, JR., J., of the First Appellate District, sitting for COOK, J.

Brian Ruschel; Chester, Willcox & Saxbe, L.L.P., and J. Craig Wright, for appellee.

Baker & Hostetler, L.L.P., Daniel R. Warren, Michael K. Farrell and Brett A. Wall, for appellant.