**Mary P. MUNOZ, individually, and on behalf of herself and all others similarly-situated, Plaintiff,**

v.

**FINANCIAL FREEDOM SENIOR FUNDING CORPORATION, Carteret Mortgage Corporation, Kathleen M. Miller, and Louis Soqui, Defendants.**

**Case No. SACV 07–00710–CJC(ANx).**

United States District Court,
C.D. California,
Southern Division.

Aug. 18, 2008.

Ingrid M. Evans, David Cheng, Steven Shaw, Renne Sloan Holtzman Sakai LLP, San Francisco, CA, Garrett Wotkyns, Bonnett Fairbourn Friedman and Balint PC, Phoenix, AZ, for Plaintiffs.

Thomas M. Hanson, Stephen C. Borgsdorf, Dykema Gossett PLLC, Ann Arbor, MI, Anthony J. Oliva, Andrew Miller, Allen Matkins Leck Gamble Mallory & Nastis LLP, for Defendant Financial Freedom Senior Funding Corporation.

Henry Ben-Zvi, Ben-Zvi and Associates, Santa Monica, CA, for Defendants Carteret Mortgage Corp. and Louis Soqui.

Michael Wilk, Lewis Brisbois, Bisgaard & Smith LLP, Los Angeles, CA, for Defendant Kathleen Miller.

**Proceedings:** DEFENDANT FINANCIAL FREEDOM SENIOR FUNDING CORPORATION'S MOTION TO DISMISS (FLD 7/14/08)

CORMAC J. CARNEY, District Judge.

Court's tentative ruling issued to counsel before case called. Court hears oral argument.

Court rules in accordance with the tentative. Final order to be issued.

## ORDER GRANTING WITH PREJUDICE DEFENDANT FINANCIAL FREEDOM'S MOTION TO DISMISS

Defendant Financial Freedom Senior Funding Corporation ("Financial Freedom") moves to dismiss the second amended class action complaint of Plaintiff Mary P. Munoz. Ms. Munoz, a senior citizen, alleges that Financial Freedom preyed upon her by selling her a reverse mortgage and failing to prohibit her from purchasing a deferred annuity with the proceeds of that reverse mortgage. Second Amended Complaint ("SAC") ¶ 1. Financial Freedom moves to dismiss Ms. Munoz's claims on the ground that they are preempted by federal law, which exclusively regulates the activities of federal savings associations. Ms. Munoz opposes Financial Freedom's motion, arguing that her claims are not preempted by federal law because they implicate only a lender's common law obligations in the marketplace, and are not specific to its lending activity. For the following reasons, Financial Freedom's motion is GRANTED WITH PREJUDICE.

## BACKGROUND

On June 2, 2008, the Court granted in part and denied in part Financial Freedom's motion for judgment on the pleadings with respect to Ms. Munoz's first amended complaint. *Munoz v. Financial Freedom Senior Funding Corp. et al.*, 567 F.Supp.2d 1156 (C.D.Cal.2008). The Court held that Ms. Munoz's claims against Financial Freedom predicated upon allegedly deceptive or illegal fees, disclosures and advertising were preempted by the Home Owners Loan Act of 1933 ("HOLA") 12 U.S.C. § 1461 (1933). However, because the Court could not definitively conclude that Ms. Munoz was unable to allege any non-preempted claims against Financial Freedom, she was afforded leave to amend her complaint. *Id.*

In her second amended complaint, Ms. Munoz, age seventy-eight, makes new allegations about the reverse mortgage transaction that she claims has caused her financial injury. In September 2004, defendant Kathleen Miller offered financial advisory services to Ms. Munoz. SAC ¶ 33. During the course of their relationship, Ms. Miller advised Ms. Munoz that a reverse mortgage would suit her financial needs by giving her ready access to the equity in her home. *Id.* The reverse mortgage was brokered by defendant Louis Soqui, a broker employed by defendant Carteret Mortgage Corporation. *Id.* Financial Freedom, the lender, "originated and/or underwrote the reverse mortgage loan entered into by Ms. Munoz." *Id.* at ¶ 18. After closing costs and fees, Ms. Munoz received $118,174, and Financial Freedom obtained a mortgage on her property as security. *See id.* at ¶ 34. One month later, in October 2004, Ms. Miller sold Ms. Munoz a deferred annuity, claiming that it was a suitable financial vehicle to provide her a steady income for the remainder of her life and to pay off her outstanding debts and expenses. *Id.* at ¶ 35. With an initial investment of $60,000 in the deferred annuity, Ms. Munoz received a monthly payment of approximately $200 per month. *Id.* When this monthly payment proved insufficient to cover her monthly and other expenses, Ms. Munoz was forced to withdraw over

$26,000 from the annuity early, incurring significant penalties and fees. *Id.* at ¶ 37.

Ms. Munoz seeks to hold Financial Freedom liable for failing to prohibit her from investing the proceeds of her reverse mortgage into a deferred annuity, *see id.* at ¶¶ 152–58, failing to inform her than an annuity purchase was not required in connection with the reverse mortgage, *id.* at ¶ 27, and failing to advise her that the annuity was "not proper" in connection with the reverse mortgage, *id.* She alleges that the practice of selling deferred annuities "concurrently" with reverse mortgages is a prohibited form of elder abuse. *Id.* at ¶ 17. To that end, Ms. Munoz alleges that Financial Freedom "is and was fully aware of the estate, tax and financial ploys utilized by Sales Agent Defendants [Ms. Miller, Mr. Soqui and Carteret]. . . ." *Id.* at ¶ 31. She claims the lender took "insufficient action to prevent these abusive marketing and sales tactics and has instead ratified these tactics and continued to accept the benefits of these abusive sales practices." *Id.*

Based on these allegations, Ms. Munoz asserts the following class claims against Financial Freedom: (1) breach of fiduciary duty by selling Ms. Munoz a reverse mortgage and "permitting unsuitable deferred annuities to be sold concurrently with its reverse mortgage loans," *id.* at ¶¶ 101–09; (2) aiding and abetting breach of fiduciary duty, *id.* at ¶¶ 110–13; (3) fraudulent concealment for failing to disclose the risk of purchasing an annuity with the proceeds of a reverse mortgage, *id.* at ¶¶ 114–25; (4) unjust enrichment for retaining fees generated by the reverse mortgage practice, *id.* at ¶¶ 126–29; (5) breach of the implied covenant of good faith and fair dealing for "failing to have a policy prohibiting the sale of deferred annuities in conjunction with the purchase of its reverse mortgage," *id.* at ¶¶ 152–58; and, (6) negligence/negligent misrepresentation for

"failing to have a policy that prohibits the sale of deferred annuities," *id.* at 159–64.

## STANDARD OF REVIEW

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in the complaint. The issue on a motion to dismiss for failure to state a claim is not whether the claimant will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims asserted. *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 249 (9th Cir.1997). When evaluating a Rule 12(b)(6) motion, the Court must accept all material allegations in the complaint as true and construe them in the light most favorable to the non-moving party. *Moyo v. Gomez*, 32 F.3d 1382, 1384 (9th Cir.1994). Rule 12(b)(6) is read in conjunction with Rule 8(a), which requires only a short and plain statement of the claim showing that the pleader is entitled to relief. FED.R.CIV.P. 8(a)(2). Dismissal of a complaint for failure to state a claim is not proper where a plaintiff has alleged "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, —— U.S. ——, 127 S.Ct. 1955, 1974, 167 L.Ed.2d 929 (2007). In keeping with this liberal pleading standard, the district court should grant the plaintiff leave to amend if the complaint can possibly be cured by additional factual allegations. *Doe v. United States*, 58 F.3d 494, 497 (9th Cir.1995).

## ANALYSIS

Financial Freedom has again moved to dismiss Ms. Munoz's complaint because her claims are preempted by federal law. Federal law may preempt state law in three ways, two of which are potentially applicable here:

First, Congress may preempt state law by so stating in express terms. Second, preemption may be inferred when federal regulation in a particular field is so

pervasive as to make reasonable the inference that Congress left no room for the States to supplement it. In such cases of field preemption, the mere volume and complexity of federal regulations demonstrate an implicitly congressional intent to displace all state law. *Bank of Am. v. City & County of S.F.*, 309 F.3d 551, 558 (9th Cir.2002) (internal quotation marks and citations omitted).[1] Typically, there is a presumption against federal preemption of state laws. That presumption does not exist, however, "when [a] state regulates in an area where there has been a history of significant federal presence." *United States v. Locke*, 529 U.S. 89, 108, 120 S.Ct. 1135, 146 L.Ed.2d 69 (2000). Banking is one such area in which Congress has created a long-standing federal regulatory framework. *See Bank of Am.*, 309 F.3d at 558 (*citing, e.g.,* *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 325–26, 4 L.Ed. 579 (1819)). For that reason, courts will not apply a presumption against preemption when analyzing federal banking statutes which are "so pervasive as to leave no room for state regulatory control." *Conf. of Fed. Sav. & Loan Ass'ns v. Stein,* 604 F.2d 1256, 1257, 1260 (9th Cir.1979), *aff'd,* 445 U.S. 921, 100 S.Ct. 1304, 63 L.Ed.2d 754 (1980); *see Bank of Am.,* 309 F.3d at 559.

Under the Home Owners' Loan Act of 1933 ("HOLA"), 12 U.S.C. § 1461 (1933), and associated regulations, Congress authorized broad authority to promulgate regulations governing savings and loan institutions to the Office of Thrift Supervision ("OTS").[2] *See* 12 U.S.C. § 1464. The regulations authored by OTS pursuant to HOLA include a preemption regulation, 12 C.F.R. § 560.2, which provides as follows:

*OTS hereby occupies the entire field of lending regulation for federal savings associations.* OTS intends to give Federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation. Accordingly, federal savings associations may extend credit as authorized under federal law, including this part, without regard to state laws purporting to regulate or otherwise affect their credit activities, except to the extent provided in paragraph (c) of this section . . . .

12 C.F.R. § 560.2(a) (emphasis added); *see Silvas v. E\*Trade Mortgage Corp.,* 514 F.3d 1001, 1005 (9th Cir.2008). In the absence of a presumption *against* preemption, and given the strong preemption language contained in the OTS regulations, the Ninth Circuit has held that HOLA preempts all state regulation of savings associations under the doctrine of field preemption. *See Conf. of Fed. Sav. & Loan Ass'ns,* 604 F.2d at 1257, 1260; *see also Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982).

The OTS regulations also contain the framework for analyzing whether a state law is preempted under HOLA. If the state law in question is of a type listed in paragraph (b) of § 560.2, "the analysis will end there; the law is preempted." OTS,

---

1. The third ground for preemption, which neither party argues is applicable to this case, is conflict preemption. Under conflict preemption, a state law is preempted when "compliance with both federal and state regulations is a physical impossibility, or when state law stands as an obstacle to the accomplishments and execution of the full purposes and objectives of Congress . . . ." *Bank of Am.,* 309 F.3d at 558.

2. Financial Freedom is a subsidiary of Indymac Bank, FSB and, according to Financial Freedom, it is therefore subject to the requirements of HOLA. Plaintiffs do not dispute this contention. *See Munoz,* 567 F.Supp.2d at 1160 n. 3.

Final Rule, 61 Fed.Reg. 50951, 50966–67 (Sept. 30, 1996). Included in paragraph (b) is a category of state regulation Financial Freedom argues is applicable here. Section 560.2(b)(10) requires preemption of state laws governing "[p]rocessing, origination, servicing, sale or purchase of, or investment or participating in, mortgages."

If the law is not one listed in paragraph (b), but nevertheless affects lending, there is a presumption that the law is preempted. *See id.* The presumption can be reversed only if the law falls within one of the exceptions of paragraph (c). Paragraph (c), however, is to be interpreted narrowly; "any doubt should be resolved in favor of preemption." *See id.* Under paragraph (c), certain specified types of state laws are not preempted to the extent they "only incidentally affect the lending operations of Federal savings associations" or are not otherwise inconsistent with the purposes of the regulation. § 560.2(c). "Tort law" is one type of state regulation that could fall within the exception of paragraph (c).[3] § 560.2(c)(4).

In her second amended complaint, Ms. Munoz's asserts the legal theory that Financial Freedom had a duty, either as a fiduciary or by operation of common law, to prohibit her from using the proceeds of her reverse mortgage to purchase a deferred annuity. She bases this proposed duty on a variety of state and federal legislative statements and enactments, as well as reports of consumer watchdog groups which all conclude that the combination of a reverse mortgage and a deferred annuity is predatory and financially risky for senior citizens. *See* Opp'n, 3–4 (*citing, e.g.,* CAL CIV.CODE § 1923.2 (2007); *Reverse Mortgages: Polishing Not Tarnishing the Golden Years: Hearing Before the Spec. Comm. On Aging,* 110th Cong. 1 (2007), opening statement of Sen. Herb Kohl, opening statement of Donald L. Redfoot, Strategic Policy Advisor, AARP Pub. Pol. Inst.) Financial Freedom argues that Ms. Munoz's amended claims, like her unfair competition claims in her first amended complaint, are preempted by HOLA. Particularly, Financial Freedom contends that any state law applied to mortgage lenders that obligates them to monitor a borrower's use of reverse mortgage proceeds necessarily implicates how the lender originates, processes or services the mortgage under § 560.2(b). It must therefore be preempted.

A state law of general applicability— that is, one which does not purport to directly regulate the conduct of mortgage lenders—may be preempted by HOLA if, "as applied," it is a type of state law that falls within § 560.2. *See Silvas,* 514 F.3d at 1006; *Munoz,* 567 F.Supp.2d at 1163–64 (holding that claims under California's unfair competition law are preempted because, as applied, they regulate charges, penalties, advertising and disclosures related to reverse mortgages). Thus, Ms. Munoz's amended claims are preempted by HOLA if her common law claims as applied would regulate the "origination, processing [or] servicing" of mortgages, or if application of the state law would more than incidentally affect lending. *See* § 560.2.

Legal authority as to what constitutes origination, processing and servicing of mortgages is limited. *See, e.g., Haehl v. Wash. Mut. Bank, F.A.,* 277 F.Supp.2d 933, 942–43 (S.D.Ind.2003); *Pinchot v. Charter One Bank, F.S.B.,* 99 Ohio St.3d 390, 792 N.E.2d 1105, 1112 (Ohio 2003);

---

**3.** Paragraph (c) also contains an exception for a state law which "(i) furthers a vital state interest; and (ii) either has only an incidental effect on lending operations or is not otherwise contrary to the purposes expressed in paragraph (a) of this section." § 560.2(c)(6). This exception only applies if OTS finds such an exception based on its review. *See id.*

*Santana v. CitiMortgage, Inc.*, 2006 WL 1530083, at *3 (Conn.Sup.Ct. May 22, 2006) (unpublished opinion). In an April 2000 opinion letter, the OTS opined that a loan payoff statement constitutes "servicing" of a mortgage under § 560.2(b)(10) because it is "an integral part of the lending process." 2000 OTS Op. No. P–2000–6, 2000 WL 1455751 (April 21, 2000). Similarly, in analyzing whether a mortgage-related activity constitutes servicing, processing or origination, one court considered the degree to which the activity is integral to the overall loan activities of the lender and borrower. *See Pinchot*, 792 N.E.2d at 1113–14 (concluding that recording the satisfaction of a mortgage is not an integral activity within the mortgage transaction).

▆▆▆▆ Any law which purports to require a lender to restrict or monitor the use of proceeds generated by a reverse mortgage implicates the origination, servicing or processing of the loan. The language of § 560.2(b)(10), in its entirety, evidences an intent on the part of OTS to cover a wide range of activities which occur during the lifetime of the mortgage. *See* § 560.2(b)(10) ("Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages"). A borrower's primary purpose in entering into a reverse mortgage transaction is to secure access to cash for immediate uses, such as living and medical expenses, debts, or housing payments. Thus, an integral aspect of the reverse mortgage process is that the cash generated from the transaction may be used for any of those purposes; it is not limited for purchasing a particular piece of property as would a standard mortgage loan. *See* SAC ¶ 8 (alleging that "[m]oney obtained through a reverse mortgage can be used for any purpose.") Were the Court to apply state laws to reverse mortgage activity in such a way as to restrict the use of those funds, the law would be regulating an integral aspect of the reverse mortgage transac-

tion, namely the borrower's freedom to use the proceeds for any purpose. *See* 2000 OTS Op. No. P–2000–6, 2000 WL 1455751. Accordingly, Ms. Munoz's state and common law claims are preempted because, as applied, they relate to integral activities within the life of the loan, including those which occur during the origination, processing, or servicing of the loan. *See* OTS, Final Rule, 61 Fed.Reg. 50951, 50966–67 (Sept. 30, 1996).

Even if Ms. Munoz's proposed application of state law was not preempted by § 560.2(b)(10), it would nevertheless be preempted under § 560.2(c). *See* § 560.2(c) (stating that state tort laws "are not preempted to the extent that they only incidentally affect the lending operations of federal savings associations"). Ms. Munoz's legal theory for recovery, if successful, would dramatically affect the lending operations of federal savings associations by imposing an obligation upon them to monitor its borrower's use of loan proceeds. As even she admits in her complaint, "[m]oney obtained through a reverse mortgage can be used for any purpose." SAC ¶ 8. To ratify her legal theory would be to change this most fundamental principle in the reverse mortgage industry. It would undoubtedly result in more than an "incidental" effect on the industry. § 560.2(c); *see Haehl*, 277 F.Supp.2d. at 942–43 (holding claims for fraud, breach of fiduciary duty, concealment, breach of the duty of good faith and fair dealing and unjust enrichment against a lender are preempted under HOLA because they "would more than incidentally affect lending operations by imposing substantive requirements on lender operations") (internal quotations omitted). Moreover, federal savings associations could be subject to fifty different sets of regulations based upon what each state's legislature determines is an appropriate or inappropriate investment for senior citi-

zens who have purchased a reverse mortgage. The purpose of the OTS preemption regulations is to foreclose just this type of potentially inconsistent and contradictory state-by-state regulatory scheme. *See* § 560.2(a) (explaining that OTS preemption regulations are designed, in part, to "give federal savings associations maximum flexibility to exercise their lending powers in accordance with a uniform federal scheme of regulation").

■ The Court further notes another major problem with Ms. Munoz's legal theory. Courts have no authority to impose restrictions on how any individual, whether a senior citizen or otherwise, can use her own money, even if that money comes from a reverse mortgage. Just as Financial Freedom has no obligation or power to prevent senior citizens from using the proceeds of a reverse mortgage at a casino (which is certainly a risky use of capital for a fixed-income senior citizen), it likewise has no obligation or power to require or restrict the investments that its customers make with their reverse mortgage proceeds. Of course, should there be allegations or evidence that Financial Freedom conspired with, instructed, contracted with, or in any other way affirmatively associated with a deferred annuity provider to swindle senior citizens, Ms. Munoz's legal theory would be more viable. However, here she only alleges that Financial Freedom was "fully aware" of the allegedly deceptive business practices of the sales agents. SAC ¶ 31. There is no allegation that there was an ongoing business relationship or conspiracy whereby Financial Freedom funded reverse mortgages to facilitate a senior citizen's purchase of a risky deferred annuity. In fact, Ms. Munoz's alleges she purchased her annuity one month after the reverse mortgage, not "concurrently" as would more plausibly create an inference of impropriety on the part of Financial Freedom.

Like her first amended complaint, Ms. Munoz has again asserted claims against Financial Freedom that are preempted by federal law. And, the claims now asserted in the second amended complaint advance a more tenuous legal theory, exposing the deficiencies in her allegations against Financial Freedom. The Court concludes that amendment would be futile and Financial Freedom's motion to dismiss is therefore GRANTED WITH PREJUDICE. *See Reddy v. Litton Indus., Inc.,* 912 F.2d 291, 296–97 (9th Cir.1990) (affirming the district court's dismissal with prejudice on the grounds that amendment would be futile).